at all. Good morning. Mr. Carlin, I see you deserve three minutes for rebuttal. Yes. Alright. You can go ahead when you're ready. May it please the Court. My name is Stuart Carlin. I represent the appellant Steven Greenbaum. There are two significant issues before the Court, I think. One is on the issue of a reasonable accommodation. The second is on the interactive process, and I would like to address both of those issues. The first thing I'd like to point out is that with all due respect to the quote below, that the New York City Human Rights Law, which requires independent liberal construction and should be construed under the prism to ensure liberal construction, requiring all provisions to be broadly in favor of discrimination plaintiffs. But it does recognize an undue hardship, right? New York City law also has the same rule that if there's an undue hardship, you don't have to provide the accommodation. That is correct, but the burden is clearly on you to not apply the right standard. Second, I would also like to remind the Court that on the issue of hardship, all during this period of time when Mr. Greenbaum placed his accommodation request in August of 2018 until he was forced to retire in September of 2019, he was paid his full salary to sit at home. He wasn't replaced, and also... I'm sorry. What does that relate to? That relates to the issue of a hardship. They're saying that he cannot, that this would be unduly burdensome... To set up the computer systems, right? I'm sorry, if you could just explain what is the relevance of his being unproductive at home? The cost was never a factor in setting up the computer systems. The question was how long, in essence, would it take to train him to get up to speed in the computer systems? That was the question, was how long it would train him? I thought part of the issue they claimed was that they didn't know if the computer systems, these programs would work on their system, and their IT department was so small that they wouldn't be able to support all these novel programs. I'm not seeing the link between him sitting at home... The Dragon software program was already being used in the law department. But not for someone with the responsibilities of your client. Their argument is that his use of the program was different than it would be used in the law department, and also obviously had the other two programs that were unprecedented in terms of the lack of use, right? Right, but the point is that, just to circle around, he was sitting at home and getting paid to sit at home. Are you suggesting they should have taken the money, I guess I'm not seeing the point, they should have taken the money that they were spending on a salary and spent it on an IT staff? Of course, that would have involved firing him. I'm not seeing the point there. There wouldn't have to be an IT staff hired, period. In fact, if they were, quite frankly, dealing with him in good faith, they would have actually picked up the telephone, called the software vendors to see what was involved in the implementation and training of someone with respect to, did some coding in his drug. And then that's one of the factual disputes in the record is how much coding he had to do. So the point I'm simply trying to make, at least at this point, he's sitting at home, he's not productive, he's not being replaced, the cost of the program is not very high, it was never really a fact society. To install the program, I don't believe... It was the ongoing troubleshooting and maintenance and updates of the program, which I think, you could correct me if I'm wrong, I think it's uncontroverted that that would have have to have been done and would have fell on their IT department. No computer programming company is going to do that type of thing for every employer. An employer has to do that, right? Right, but the point is that software installation, maintenance upgrades, addressing problems as they are common features of computer and networking services. This is not something unusual, and it's speculation. We don't know how much would be required in terms of upgrades. One of your arguments is that they were required under the law to try it out. Yes. That if they don't try out the accommodation, that would be the holding of this case? That if you don't test the accommodation or try it out for some period of time, then you've acted unreasonably? Well, this is also a fact. Don't forget, he did try the program out at home. Their own internal documents, which are referenced in the brief, basically said, why not just try it out? Kick the tires. I mean, I could read all these emails going back and forth internally. Even Buckley said that at some point in time, why not just give this a shot, period. He's already tried it out at home and it worked. What does the record say, and I understand your point that your clients put in evidence that he tried the programs, they worked, and that the employer put in evidence that we don't want to try them because it will be an undue hardship and there are so many problems that could arise. And I guess your argument would be, at least there, there's a factual dispute then as to whether these things would work. What precisely did your client say when he said he tried out the programs and they worked? He tried them on his home computer, right? Did he say he tried them on the employer's system? Because, I mean, that's different, right? I mean, putting a program on your computer may work great, but putting it onto a business's overarching system that could have different system software and operating systems, I mean, it could be a different thing. What specifically did he say about how he tried it out that is suggestive of the fact that it would have worked fine on his employer's system? He was not able to try it out on the employer's system. He was only able to try it out on the home system. And did he say anything about the comparability of his home system to the work system? Do we have evidence? Did he say, look, you operate on, this is going to date me, but Windows XP and I have Windows XP and it all worked fine? He submitted that he didn't see the distinction, to be quite frank, that it wouldn't work. But it certainly provides a basis to say, okay, it's worked at his home. He tried it out at his own cost, period. The own internal IT departments, emails going back and forth, said, give it a try. And he was prevented from doing so. All during this time, he's getting paid to sit at home with no replacement. We'll have them respond to that. Thank you. All right. Ms. Petcock. May it please the Court. Good morning, Your Honor. I guess I'll start with the reasonable accommodation request in this case. I think the lower court made the right decision here. It was appropriately denied. Oh, I'm sorry. I'm going to have to take that off so you can see my face. I got so used to it. Why shouldn't they have tested it at the workplace? What would have been the hardship with trying it out on the system just to see whether, as was pointed out, whether it works with the other systems? Obviously, at home it's not the same as at work. So that's a valid point, but why not allow him to try it in the office? I think there's a couple of different reasons why. One is this is a very important system that he's working on. It's the budget system for the New York City Transit Authority. And so the work he's doing is time-sensitive, but also the programs themselves are somewhat unique to New York City Transit. There's not a lot of support for them. There's evidence in the record that the programs on a regular basis would stop working when there were security patches implemented. And then his supervisors would spend a long time on the phone with MTA IT trying to get them to work again. And so introducing another point of failure into the system is not just, oh, let him try it and see what happens. It's not something that he could do on his own. Did any of the experts from the city's side say exactly what you just said? That is, is there a statement that we are afraid to test it because testing it itself would potentially cause these difficulties? There's not. Initially, when... But doesn't that make a difference? I don't want to cut you off completely there because I want to hear more about that subject. But isn't there a difference between saying we're worried that in the long run this is going to introduce new vulnerabilities into the system and so on? But is that worry in itself enough to say that speculation, that potential problem, is enough to say we shouldn't even test it? We're not even going to try? Absent some concern that the testing is going to cause a problem. As soon as you put this on, the whole system could break down. But no one said that, did they? No, and Your Honor, I don't believe that there is a concern that initially you load the programs and the whole system just collapses. They're reputable programs. There's no dispute about that. These are real programs. The concern was really the very significant concern about ongoing maintenance and that on a regular basis the system would have problems. And it was his supervisors who were going to be called in to try to deal with that. But what is the basis? I understand why one would be generally cautious, conservative about any risks to the system. But if you're just saying the heavens could fall without some concrete basis for saying the heavens could fall from this in particular, that gives me some concern. I think that's what Mr. Cronin means by saying it's speculative. Your Honor, I'm just going back to the e-mail that Mr. Fisk sent while they were in the midst of this process. And he noted that they were dealing on a daily basis with problems supporting very specific programs that they used in the budget office. Hyperion planning, Smart View, add-in within Excel. He said it was frequently disabled and it causes them to lose critical use of the programs. And they were concerned about adding in. It's not a vital concern to add in another program and another point of failure. Adding another program in itself is just a non-starter is their view. I don't know if it's a non-starter. They actually did talk about testing it when they thought it initially was just the Dragon program and not the three programs together. I.T. and Ms. Buckley's first instinct was, well, let him try it out. And then as they got more detail from the I.T. department about what these programs entailed and what this might look like and how much support I.T. could provide, then they suddenly were thinking maybe this isn't actually going to work for us after all. And how does that contrast with Mr. Greenbaum's expert? One thing, when I was, frankly, I usually read the district court opinion first. I read the district court's opinion. And I kept thinking, okay, so when are we going to hear what the plaintiff's expert says? And there was never anything about it. And I thought, oh, this is going to be an easy case. I guess the plaintiff doesn't have any expert testimony. And it turned out he did. So doesn't she say that these are not real serious concerns? These programs are in use in a lot of places and they don't cause a lot of problems? And doesn't that create some sort of issue effect? The plaintiff's expert had never seen these three programs used together. There's no dispute that each of these programs is a stand-alone program. It's a good piece of technology and it works for its intended purpose. The problem here is the novel nature of putting these three pieces of technology together. And then on top of that, using them for a new purpose, using them for computer programming. Can I just interrupt there? But your expert didn't say, well, I have seen these three programs together and that causes a problem. I thought that your expert said it's novel and, wow, who knows? It seems to me that your evidence is really arguably proof that there might be undue hardship. And you don't want to find out. I know I'm paraphrasing a little bit. So I guess why isn't that a question of fact? Maybe your expert's right. Maybe the heavens will fall or the system will at least crash. Or maybe Mr. Greenbaum is right, that actually this is going to be installed and work swimmingly. Isn't that a question of fact? Why are we here in summary judgment, I guess is the question. I think, Your Honor, the answer is that what we need to look at here is not whether hypothetically this program might have worked or might not have worked. His supervisors needed to make a decision at that time. No, they didn't. If the sky wasn't going to fall, as Judge Lynch pointed out, by just trying it out, if there wasn't a concern that the whole system would crash, then they didn't have to make a decision at that point. They could have said, let's try it out. Maybe not in his normal work, just like as a test run on something that's not real, to see if they work on our overlays and then make a decision. That would be another option. I thought that what you're arguing is that even if it worked initially, that the ongoing support of it over time was a nonstarter. I thought that was the argument that was being made, because even if it worked initially for some period of time, that over time it's going to have to be updated and troubleshooted. I thought that was the argument, but maybe I was not understanding it. That's right. Even if it did work, how long would you let him test it for? Do we have to wait until it fails and then we have to terminate him? The employer needed to make a decision based on the information that was available to them as to whether this was a feasible solution for Mr. Greenbaum being able to come back to work, presumably to use this technology going forward. Living under the threat that at some point we may have to terminate you because the system stops working and suddenly you show up to work one day and we can't figure out how to make it work again, I don't think that's a reasonable basis for an employer to be working on going forward. Why doesn't the expert's report, just to go back to my colleague's question, why doesn't that create an issue of fact? Just the report itself, why doesn't that create an issue of fact? Our expert? No, their expert. They have an expert who has evaluated the programs, what his job functions are, and has concluded that this could work, that what your in-house people are saying is not necessarily accurate, so why shouldn't there be a trial about that? Their expert had never seen these products work. Her opinion was completely speculative. Neither has the in-house people because they didn't test it either. Neither side has seen these products work or not work, right? Their expert opines, she believes, that if tested, they would work. And your in-house people, tech people, think no. That's right, Your Honor. No one has actually seen whether these three products could work together on the system. But you're the ones who have to prove undue hardship. That's the thing. If we're left guessing, right, on the record, saying, well, somebody's speculating it'll work, somebody's speculating it might not work, wouldn't the natural conclusion have to be that you haven't shown your burden of an undue hardship? Basically, tie goes to the runner, meaning Mr. Greenbaum's the runner in this circumstance. Certainly the burden is on the defendant to show undue hardship. I think that their very serious contemporaneous concerns about whether they would be able to do ongoing maintenance of the program is their undue hardship. We can assume, for purposes of argument, that you could put the programs on the system and that initially it would work. But at some point they had real serious reason to believe that they would stop working and somebody, presumably his supervisor, who's not a technology person, was going to have to figure out how to make it work again. And they had reason to believe that that would happen every time there was a security update or a patch implemented to the system and they would show up to work in the morning. But if that's true, or rather, if the basis for that is their experience running their regular systems, it's sort of a little hard to imagine how they survive. If it's true that every time there's a security update or every time there's an update to a program, everything breaks, and then you have to ask the person who isn't even in IT to fix it? If that's what you just said is going to happen with these programs, and the reason is because that's what's already happening? But if it's already happening, aren't they kind of hacking their way through it? I just don't quite grasp what this fear is about. And that's fine. I mean, I'm not an expert. These people are experts. I understand that they have this opinion. But unless we're going to say we just defer to the very people who are getting sued to decide what's an undue hardship and necessarily credit their direct experience with their system, not necessarily with these programs, over that of someone who says, you know, when you say she's never seen these three programs put together in the same place and work the same way, okay. But she does say other companies have used these programs at least each individually, and none of them seem to cause problems, and they do seem to work the way they're supposed to. So why, again, I just come back to, is it because inherently the employer knows more about the employer's systems that not only a jury could say, well, I guess I have to credit them because they know more about the inside, but that they automatically win because of that? I realize I'm out of time. If I could just respond briefly. The difference between this particular program or the combination of the three programs he wanted to use and the problems they ordinarily had on a frequent basis is that MTAIT did not have in-house knowledge about how to fix it. So the record shows that when the normal programs would break, they would call the help desk, and somebody there would have to do some research and figure it out. But they were supporting hundreds of people who used those programs. Now you have Mr. Greenbaum using three programs that only he or he and maybe three or four other people in the entire organization use. There isn't that in-house knowledge base. But that's another point. There is an in-house knowledge base about at least one of these programs, right? Because other people who IT supports are using it. Maybe no one in Mr. Greenbaum's particular department is, but the people who are responsible for maintenance must do the maintenance because they do have, is it Dragon, is the one that's in use somewhere in the MTA. That's right. I think the record shows there were about six people in the MTA using Dragon. So there's maybe a very small amount. But whether it's a small amount or a large amount, the program is on the computers somewhere, and there are people who know how to deal with the problems with it as well as they know how to deal with any of the other programs that they have to use. It doesn't matter whether they're supporting a program that everybody uses or a program that six people use. The fact is it would be adding a seventh person using it, and there's somebody, presumably in IT, who's been responsible for understanding that program. I don't think the problem, respectively, is that the Dragon program itself. I think the problem would be the connection between Dragon and the budget-specific programs. He was the only person who would have been using Dragon plus Voice Computer plus Toad with the specific programs that they use for the budget process. But again, is there any concrete reason? Does somebody say, look, this program that he wants to use, or this combination of programs, is likely to be incompatible because it uses XYZ programming language, and ours use something different? I didn't see anything like that. It's just a generalized fear that anything new is, and I appreciate that as a computer user, that I have the feeling sometimes that anything new is just going to cause me trouble. But I don't know if that's a valid reason to say, therefore, we should not innovate. Our expert did have some very serious concerns about the levels of complexity. None of these is a simple program, and so if you layer complexity upon complexity with a number of budget programs that are themselves outdated and very complex, you end up with many potential points of failure. The fact that it doesn't happen immediately doesn't mean it's a theoretical concern. It is a real issue that does happen for this office. Thank you very much. I'd like just to make a couple of points here. First of all, Mr. Fisk, Ms. Buckley are not experts. They're not familiar with computers. They're not computer programmers or computer specialists. They're managers. So they're, in essence, even incompetent to make a determination. Well, I mean, did you make some sort of daubert motion below? Did the district court make a ruling on whether their testimony should be allowed? No, they weren't submitted as experts, but their rationale. But there's a lot in the record of them communicating with the IT people who are obviously experts in this type of issue. So it wasn't like they were making these judgments on their own. They put in a lot of documentation about the back and forth about these issues, right? Well, the answer is no. We don't know who they spoke to, who he spoke to. It's not identified. Did you make a motion to the district court that said, these people are giving testimony that only would work if they are treated as experts and they are unqualified to give that testimony, so that should be excluded? No. Right, just as the city, which spends a lot of its brief attacking Ms. Henriquez, never made a daubert motion to say she uses bad methodology, be a gatekeeper and throw it out. So aren't we on both sides stuck with, here's what these people have testified to, and no one made a motion to say that that's all inadmissible. So there it is in the record, and that's the record we have to deal with, right? That's correct. A couple of other points that have also been sort of lost is that my client, Mr. Bringdown, could type for four hours a day, 30 minutes at a stretch. So even assuming for the moment there was some sort of a hiccup, he never had four hours worth of coding a day, at most it was 20 minutes, 30 minutes, and he could simply do the coding portion of the typing, typing the code into the computer during those four hours. And what gave him the most pain and caused the most problems for him were cutting and pasting, and voicing and texting, where it gets translated into text. That is the Dragon program, which clearly works, and it was worked in the law department, and it would have worked, obviously, in the budget department that he was in. So even if there was some sort of hiccup in that respect, he could have addressed it simply because he could type four hours a day. This is not someone who could not type at all. The other issue is the maintenance issue, and again, that's speculation. We don't know how much it would have cost for a maintenance contract. There's nothing in the record about how much it would cost for a maintenance contract, because they didn't even bother calling any of the software vendors to say how much would it cost. So the record is completely devoid, other than the fact that we're not experts, and we can't fix it. Well, there's a thing called a maintenance contract. A lot of law offices have maintenance contracts, and people come in and fix it, if there's some sort of a hiccup, fix it. But they didn't bother calling the software vendor. Now, one person called the software vendor to say, first of all, does the program work, and according to my client, it worked, and according to my expert, it worked, but they didn't even call to find out what was involved. If they were dealing with Mr. Greenman in good faith, they would have called the vendor or vendors and found that out. Thank you, Mr. Carlin. Thank you to both sides. We'll reserve decision. Have a good day.